MARY NORTH, Appellee, *vs.* SAMUEL GRAHAM *et al.* Appellants.

*Opinion filed June 18, 1908.*

1. DEEDS—*when deed to church creates a determinable fee.* A deed conveying land to a church organization, which provides that said tract of land shall "revert to the party of the first part whenever it ceases to be used or occupied for a meeting house or church," creates a determinable fee, which continues so long as the land is devoted to the purposes of a meeting house or church.

2. SAME—*possibility of reverter, in case of a determinable fee, does not pass under quit-claim deed.* The possibility of reverter, where land has been conveyed by a deed which provides that the property shall revert to the grantor in case it ceases to be used for the purposes for which it was granted, is not such an estate as the grantor can convey or assign, and does not pass under a quit-claim deed made before the reverter takes place.

3. SAME—*possibility of reverter descends to grantor's heirs who were in existence at his death.* Where a grantor of a determinable fee dies before the happening of the event which is to terminate the fee and effect a reversion to the grantor, the possibility of reverter descends to the heirs of the grantor who were in existence at the time of his death, and not merely to those who were in existence when the event happened which terminated the fee.

4. Descent—*word "estate" refers to all interests in property.* The word "estate," as used in the Illinois statutes controlling the devise and descent of property, refers to all interests in property to which deceased shall be entitled, without reference to actual seizin.

5. Ejectment—*defendant may set up title acquired after commencement of suit.* In ejectment the burden of proof is upon the plaintiff, and if the defendant acquires title to a half interest in the property subsequent to the commencement of the suit, he may set up such title and to that exent defeat the plaintiff's recovery.

Appeal from the Circuit Court of Edgar county; the Hon. James W. Craig, Judge, presiding.

H. S. Tanner, and F. C. VanSellar, for appellants.

Frank T. O'Hair, for appellee.

Mr. Justice Carter delivered the opinion of the court:

This is an action in ejectment brought by appellee in the circuit court of Edgar county against appellants to settle the ownership of a small tract, containing about a quarter of an acre of land, situated in that county. At the February term, 1906, judgment was entered in favor of appellee, and appellants thereafter took a new trial as provided by statute. The case was heard a second time, jury being waived, at the June term, 1907, of said court. At this trial the court entered judgment, holding that appellee was the owner of and entitled to the possession of the property in question. An appeal was thereupon prayed to this court.

From the agreed statement of facts it appears that Adam Stewart died in 1888, intestate, leaving no widow and leaving as his only heirs-at-law his three daughters, Martha Stewart, Demeris Snyder and the appellee, Mary North. Martha Stewart died in 1889, unmarried and without children. Demeris Snyder died in 1892, leaving W. W. Snyder her husband and Myrtle Snyder her daughter and only heir-at-law. Myrtle Snyder died in 1898, unmarried, leaving the said W. W. Snyder, her father, her only heir-at-law. It appears that Adam Stewart and his wife, February 1,

1877, made a deed of the land in question to the trustees of a Methodist church called "Pilot Class," of Edgar county, containing this provision: "Said tract of land above described to revert to the party of the first part whenever it ceases to be used or occupied for a meeting house or church." On July 10, 1886, Adam Stewart and wife quit-claimed the eighty-acre tract of which this meeting house piece formed a part, with other property, to his brother, James Stewart, and the property thereafter, by a chain of conveyances, was conveyed from James Stewart to the appellants in this case.

Appellants' first contention is that there is nothing in the record to show that there was such an organization as the Pilot Class church in existence at the time of the deed from Adam Stewart, in 1877, and that it was incumbent upon appellee to prove this fact. We cannot agree with this contention, as appellants have recognized, by their stipulation of facts, the existence of the Pilot Class church in these words: "It is agreed that the tract of land in question ceased to be used and occupied for a meeting house or church, as provided in the deed from Adam Stewart to the trustees of Pilot Class, of the county of Edgar and State of Illinois, dated February 1, 1877, in the month of August, 1904, and that the building theretofore used as a meeting house or place of worship was removed from said premises in October, 1905."

Appellants make the further contention that whatever title passed to the church under said provision of the deed created a reversion in Adam Stewart and his heirs, and as a reversion may be conveyed, (2 Washburn on Real Prop.—4th ed.—*389,) the deed from Adam to his brother, James, included and conveyed all the reversionary interest of Adam and his heirs. The estate taken by the church was a fee, because it was to continue in said organization as long as the land was devoted to the specified uses, which might be forever, but as it might end on the happening of an event it is what is usually called a "determinable or qualified fee."

(*First Universalist Society* v. *Boland,* 155 Mass. 171.)
"Where one grants a base or determinable fee, since what
is left in him is only a right to defeat the estate so granted
upon the happening of a contingency, there is no reversion
in him,—that is, he has no future vested estate in fee, but
only what is called a naked possibility of reverter, which is
incapable of alienation or devise, although it descends to his
heirs." (Tiedeman on Real Prop.—3d ed.—sec. 291.)   In
Challis on Law of Real Property (p. 63) it is stated: "Pos-
sibility of reverter denotes no estate, but, as the name im-
plies, only the possibility to have an estate at a future time.
Of such possibilities there are several kinds, of which two
are usually denoted by the term now under consideration,—
(1) the possibility that a common law fee may return to
the grantor by breach of a condition subject to which it
was granted; and (2) the possibility that a common law
fee, other than a fee simple, may revert to the grantor by
the natural determination of the fee." The possibility of
reversion expectant on such an estate as the one we are now
considering is left in the person who limits it, but "in the
meantime the whole estate is in the grantee or owner, sub-
ject only to a possibility of reverter in the grantor. The
grantee has an estate which may continue forever, though
there is a contingency which, when it happens, will deter-
mine the estate. This contingency cannot with propriety
be called a condition. It is a part of the limitation, and the
estate may be termed a fee. Plowden uses the phrase, 'fee
simple determinable.' " (1 Preston on Estates, 441, 484.)
"Some estates were terminable by special or collateral limi-
tations. * * * On the happening of the contingency the
feoffer was in of his old estate without entry. * * *
After such a fee it has commonly been supposed that there
could be no remainder, but there was a so-called possibility
of reverter to the feoffer and his heirs which was not alien-
able." (Gray on Rule Against Perpetuities,—2d ed.—sec.
13.) This author (sec. 32) questions whether there is now

any such estate as a qualified or terminable fee, stating that it has not been sustained in England since the statute *Quia Emptores,* and argues that it ought not now to be sustained in this country. An estate of this nature has so frequently been upheld by this court (*Fifer* v. *Allen,* 228 Ill. 507; *Becker* v. *Becker,* 206 id. 53, and cases cited;) that it must be held to be recognized as the settled law in this State. This is in accord with the great weight of authority in this country. (1 Jones on Law of Real Prop.—secs. 630, 631; 2 Washburn on Real Prop.—4th ed.—*390; Kales on Future Interests, secs. 124, 126; 4 Kent's Com.—12th ed.—*390; 1 Tiffany on Law of Real Prop. secs. 81, 115, 116; 24 Am. & Eng. Ency. of Law,—2d ed.—425; *First Universalist Society* v. *Boland, supra; Carney* v. *Kain,* 40 W. Va. 758, and cases cited.) Moreover, Gray concludes (sec. 41*a*) that a sound distinction in this regard may be made when property is given for charitable purposes, and that "possibilities of reverter might be allowed where the first estate was for a charitable purpose; and it would seem immaterial whether the estate had been acquired by sale or gift." This court in *Mott* v. *Danville Seminary,* 129 Ill. 403, and *Presbyterian Church* v. *Venable,* 159 id. 215, has held that a possibility of reverter was recognized by the law of this State.

Appellants contend that the decisions just referred to must be distinguished from this proceeding because in those cases "the fee was absolute, subject only to the rule governing the disposition of undisposed of real estate of that kind upon dissolution" of a corporation. Manifestly, from the authorities cited, this distinction does not exist. Indeed, in *Mott* v. *Danville Seminary* a provision or condition such as the one found in this deed was passed upon, and this court said (p. 415): "The deed from Mrs. Lamon to the board of trustees of the original seminary was made upon condition that the trustees' should maintain upon the land an institution of learning in accordance with the provisions of

the act of 1849. The condition so contained in the deed is known to the law as a condition subsequent. This being so, the effect of the deed was to vest a fee simple estate in the board, subject to be defeated by their non-compliance with the condition." The recent decision of *Miller* v. *Riddle,* 227 Ill. 53, tends strongly to uphold the same conclusion. The right which remained to the grantor and his heirs under this deed represents whatever was not conveyed by the deed,—that is, "the possibility that the land may revert to the grantor or his heirs when the granted estate determines." (*Universalist Society* v. *Boland, supra.*) It is clear from these authorities that the right remaining in the grantor, Adam Stewart, after he had given the deed to the church organization, (so long as it was a mere possibility of reverter,) was not one that he could convey or assign, and hence his quit-claim deed given thereafter to his brother conveyed no interest of any kind or nature in the land in question. *Presbyterian Church* v. *Venable, supra.*

Appellants make the further contention that even though the deed in question reserved in the grantor and his heirs only the possibility of a reverter, still the court should not have entered judgment in favor of appellee for all the premises; that the three daughters of Adam Stewart succeeded him, at his death, in the ownership of this possibility of reverter; that one daughter, Martha Stewart, died unmarried, without children, leaving her sisters, Demeris Snyder and appellee, who succeeded her as owners of her interest in this possibility of reverter, and that Demeris Snyder's interest descended to her daughter, Myrtle, and through her to her father, William W. Snyder, who has since conveyed whatever interest he had to appellants. The authorities lay down the rule that the possibility of reverter, while it can not be alienated or devised by the grantor, may "descend to his heirs." (*Presbyterian Church* v. *Venable, supra.*) Did the land in question revert or descend to the grantor's heirs who were in existence at the time of his death, or to his

heirs who were in existence at the time the fee in question terminated? The authorities do not appear to discuss this precise question. The right or interest under the possibility of reverter is very like, though, as we have seen, not strictly identical with, a reversion. (Kales on Future Interests, sec. 1.) In Preston on Estates (vol. 1, 445,) it is stated "that succession by heirship to these determinable fees is in the same order and under the same rules as the succession to estates in fee simple." Under the common law the reversion descended to the heirs of the person who was last seized in fee. (Tiedeman on Real Prop.—3d ed.—sec. 293; 4 Kent's Com. *388.) Though the law passed an inheritance to the heir immediately upon the ancestor's death, he thereby only acquired a seizin in law, and this, alone, would not enable him to transmit the inheritance to his heirs. He must have obtained an actual seizin or possession or seizin in deed, according to the maxim *seisina facit stipitem,* as contradistinguished from a seizin in law, in order to make the estate transmissible to his heirs. (27 Am. & Eng. Ency. of Law,—2d ed.—297.) This common law doctrine was followed by the courts in early decisions of some of our States but was repudiated by many, and has now been abrogated in most, if not all, so that "reversions and remainders vested by descent pass to the heirs in like manner as other estates, and no distinction is made between estates in possession and in reversion." 4 Kent's Com. *389; Tiedeman on Real Prop. (3d ed.) sec. 293.

The laws of this State governing devises and descent of property are wholly statutory, as none of the common law provisions relating thereto are now in force in Illinois. (*Kochersperger* v. *Drake,* 167 Ill. 122; *In re Mulford,* 217 id. 242; *Collins* v. *Metropolitan Life Ins. Co.* 232 id. 37.) The right or interest remaining under the said deed in the grantor, Adam Stewart, as we have seen, was such a right or interest as descended to his heirs. Our statute on descent states that "estates, both real and personal, of resident

and non-resident proprietors in this State dying intestate * * * shall descend," etc. The word "estate" is used with a variety of meanings. (16 Cyc. 599.) In its primary and technical sense it referred only to an interest in land, and doubtless that was its meaning under the common law definition of possibility of reverter. In our statutes controlling descent and devise of property it undoubtedly refers to all interests in property to which the deceased shall be entitled. In *Greenwood* v. *Greenwood,* 178 Ill. 387, we held (p. 398): "The word 'estate' has a broad signification, and would, of course, be sufficient to pass personalty." Real and personal property, under our statutes, are treated together for the purpose of tracing descent. This common law doctrine to which we have just referred never had any relation to the distribution of personal property. We think it must be held in this State that on the death of the ancestor the descent, whether as to real or personal property, was cast upon the heirs, without reference to the actual seizin of the ancestor. (*Hillhouse* v. *Chester,* 3 Conn. 166.) Indeed, it was held by Justice Story in *Cook* v. *Hammond,* 4 Mason, 467, that the word "seizin," under acts of descent in this country, was equivalent to "ownership." In *Miller* v. *Miller,* 51 Mass. 393, that court, in discussing a similar question, speaking through Chief Justice Shaw, said (p. 400): "But even if the vesting of the estate were suspended until the happening of any event, when the event does happen the right by descent must depend upon the law as it stood when the descent was cast. Suppose an estate was granted sixty years ago, in 1785, upon a condition subsequent and the grantee died the year following, and now the event happens upon which the estate, by force of the condition, is defeated and the heirs of the grantor become entitled to enter, and the question is, who are his heirs? Would it not be those who were the heirs of the donor at the time of his decease, in 1786? The benefit of the condition,—the *scintilla juris*,—then vested in them, viz., the

right to enter for the condition broken; and whether the condition were broken before or after the change of the law, 1st of January, 1790, the same persons would be heirs, constituted so by law, taking in the proportion fixed by that law when they became heirs." We find no cases in this State exactly in point but some very similar in principle. In *Harrison* v. *Weatherby,* 180 Ill. 418, we said (p. 444) : "Where a testator creates a life estate and then disposes of the fee by contingent remainder which is void or for any reason fails, then the fee goes as intestate property to the testator's heirs-at-law,—not to those who are the heirs-at-law at the time of the death of the life tenant, but to those who are the heirs-at-law at the time of testator's death." This same doctrine was re-affirmed by this court in *Peterson* v. *Jackson,* 196 Ill. 40, and *Chapin* v. *Nott,* 203 id. 341.

The right or interest reserved by the deed in question to the grantor and his heirs must have been in some one between the death of the original grantor, Adam Stewart, and the determination of the estate when the property ceased to be used and occupied as a church. It is an interest that is inherited, and therefore must have been cast by descent upon Adam Stewart's heirs at the time of his death and did not originate at the time the property ceased to be used for church purposes. This conclusion is supported by the great weight of authority and is in harmony with the customs and practice, not only in this State but of the country at large. Under this rule the three daughters of Adam Stewart inherited this interest in equal parts. Through the deaths of various heirs, one-half interest descended to William W. Snyder, the husband of one of these daughters, and was owned by him at the time said property ceased to be used as a church. He thereafter, May 5, 1906, after the commencement of this suit, quit-claimed his interest to Samuel Graham, one of the appellants herein.

The burden of proof in ejectment is upon the plaintiff. We have held that the defendant can defeat recovery by

showing title out of the plaintiff or right of possession in third parties. (*Cobb* v. *Lavalle*, 89 Ill. 331; *Woods* v. *Soucy*, 184 id. 568; *Chicago and Eastern Illinois Railroad Co.* v. *Clapp*, 201 id. 418.) From this it necessarily follows that appellants could defeat appellee's right to the entire property by showing title in themselves, even though the same was acquired subsequent to the commencement of the suit. (See on this point 15 Cyc. 63, and *Duggan* v. *McCullough*, 27 Colo. 43.) We assume that appellants claimed the exclusive right of possession adverse to appellee, and hence the action of ejectment was authorized. (Hurd's Stat. 1905, chap. 45, sec. 26, p. 847; *Lundy* v. *Lundy*, 131 Ill. 138.) The trial court should have entered judgment in favor of appellee, not for the entire premises, but for one-half the premises.

For the reasons indicated, the judgment of the circuit court will be reversed and the cause remanded.

*Reversed and remanded.*